THE FIRST COMMERCIAL BANK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4322–62.   Filed November 26, 1965.

*Benjamin Alpert* and *Myles J. Sachs*, for the petitioner.
*Nelson E. Shafer*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax in the amounts of $46,114.69 for the taxable year ended June 30, 1960, and $10,370.84 for the short taxable year July 1, 1960, through December 31, 1960.

The issue for decision is whether petitioner should be allowed deductions for additions to its reserve for bad debts in the respective amounts of $85,852.22 and $23,000 for its taxable year ended June 30, 1960, and its short taxable year July 1, 1960, through December 31, 1960.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner, a commercial bank incorporated under the laws of the State of Illinois, commenced operations on or about September 18, 1946. Petitioner's banking office is located at 6945 North Clark Street, Chicago, Ill.

Petitioner filed its Federal income tax returns for the taxable year ended June 30, 1960, and for the short taxable year July 1, 1960, through December 31, 1960, with the district director of internal revenue, Chicago, Ill.

Petitioner adopted the reserve method of accounting for bad debts sometime prior to its taxable year ended June 30, 1960. For the taxable years here involved petitioner elected to compute additions to its bad debt reserve under the so-called alternative method outlined in Rev. Rul. 54–148, 1954–1 C.B. 60. Petitioner chose to use an average experience factor based on a cumulative 20-year period beginning January 1, 1928, and ending December 31, 1947. Petitioner used the loss experience of all loans of member banks of the Seventh Federal Reserve District (which includes Chicago banks) as shown by statements of condition and earnings and profits reports filed with the Federal Reserve Bank of Chicago for the 20-year period. Although petitioner used a bad debt factor on its return of 0.008375, it is stipulated that the factor which should have been used under petitioner's method of computation was 0.008325.

An analysis of petitioner's bad debt reserve as shown on its income tax returns for the taxable years ended June 30, 1947, through June 30, 1960, the short taxable year July 1 through December 31, 1960, and the taxable years ended December 31, 1961, through December 31, 1963, shows the following:

| Taxable years ended— | Total net bad debt chargeoffs | Bad debt reserve before current addition | Addition to bad debt reserve | Bad debt reserve after addition |
|---|---|---|---|---|
| *June 30—* | | | | |
| 1947 | 0 | 0 | 0 | 0 |
| 1948 | 0 | $2,961 | $13,307 | $16,268 |
| 1949 | $2,963 | 13,305 | 6,463 | 19,768 |
| 1950 | 5,156 | 14,612 | 16,096 | 30,708 |
| 1951 | 9,972 | 20,736 | 10,000 | 30,736 |
| 1952 | 7,125 | 23,611 | 15,000 | 38,611 |
| 1953 | 38,832 | (221) | 28,533 | 28,312 |
| 1954 | [1] 28,544 | (232) | 21,973 | 21,741 |
| 1955 | (2,544) | 24,285 | 65,515 | 89,800 |
| 1956 | 10,572 | 79,228 | 88,838 | 168,066 |
| 1957 | 26,484 | 141,582 | 84,649 | 226,231 |
| 1958 | 28,064 | 198,167 | 89,445 | 287,612 |
| 1959 | 59,910 | 227,702 | 103,381 | 331,083 |
| 1960 | 44,091 | 286,992 | 85,852 | 372,844 |
| *Dec. 31—* | | | | |
| 1960 (July 1–Dec. 31) | 11,991 | 360,853 | 23,000 | 383,853 |
| 1961 | 26,036 | 357,817 | 0 | 357,817 |
| 1962 | 95,271 | 262,546 | 0 | 262,546 |
| 1963 | 28,127 | 234,419 | 0 | 234,419 |

[1] Represents $6,571 charged to the reserve per books, plus $21,973 charged directly to undivided profits per books.

An analysis of petitioner's net bad debt chargeoffs for the taxable years ended June 30, 1947, through June 30, 1960, the taxable year July 1 through December 30, 1960, and the taxable years ended December 31, 1961, through December 31, 1963, shows the following:

| Taxable years ended— | Total net charge-offs | All other | Dealer appliances | Dealer auto | FHA | Home improvements | Mobile homes | Real estate mortgage |
|---|---|---|---|---|---|---|---|---|
| *June 30—* | | | | | | | | |
| 1947 | 0 | | | | | | | |
| 1948 | 0 | | | | | | | |
| 1949 | $2,963 | $2,963 | | | | | | |
| 1950 | 5,156 | 5,156 | | | | | | |
| 1951 | 9,972 | 3,790 | $6,182 | | | | | |
| 1952 | 7,125 | 5,780 | 1,345 | | | | | |
| 1953 | 38,832 | 7,942 | (776) | $31,666 | | | | |
| 1954 | [1] 28,544 | (167) | 577 | 28,134 | | | | |
| 1955 | (2,544) | (533) | (146) | (1,865) | | | | |
| 1956 | 10,572 | 2,178 | (338) | 1,507 | $551 | $6,674 | | |
| 1957 | 26,484 | 1,169 | (146) | (605) | 812 | 25,254 | | |
| 1958 | 28,064 | 3,226 | (10) | 5,901 | 980 | 17,967 | | |
| 1959 | 59,910 | 2,806 | 350 | 9,763 | 4,577 | 42,414 | | |
| 1960 | 44,091 | 16,613 | (348) | 14,786 | 2,043 | 10,997 | | |
| *Dec. 31—* | | | | | | | | |
| 1960 (July 1 to Dec. 31) | 11,991 | (2,693) | (161) | 13,126 | 1,428 | 291 | | |
| 1961 | 26,036 | (6,883) | 206 | 21,255 | 5,956 | 688 | $4,814 | |
| 1962 | 95,271 | 80,127 | 2,296 | 17,630 | 4,058 | (5,464) | (3,412) | $36 |
| 1963 | 28,127 | 15,392 | (126) | 13,587 | 2,685 | (7,048) | | 3,637 |

[1] Represents $6,571 charged to the reserve per books, plus $21,973 charged directly to undivided profits per return.

An analysis of petitioner's total closing loan balances as of the end of the taxable years ended June 30, 1947, through June 30, 1960, the short taxable year July 1, 1960, through December 31, 1960, and the taxable years ended December 31, 1961, through December 31, 1963, shows the following:

| | Taxable year ended— June 30— | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 | 1954 |
| Demand (secured and unsecured) | $179,097 | $19,111 | $14,640 | $32,510 | $36,462 | $197,659 | $88,248 | $75,209 |
| Secured—time | 416,604 | 434,137 | 494,892 | 733,524 | 798,123 | 686,738 | 720,553 | 670,287 |
| Unsecured—time | 40,726 | 65,182 | 74,591 | 109,758 | 200,603 | 398,476 | 382,110 | 352,493 |
| FHA title I | | 593,375 | 531,667 | 443,798 | 591,236 | 729,903 | 1,245,200 | 2,015,346 |
| FHA title II | | | 86,393 | 513,099 | 604,544 | 1,813,891 | 1,826,229 | 1,625,942 |
| Installment | 424,515 | 227,692 | 324,739 | 611,279 | 415,122 | 658,444 | 634,450 | 661,847 |
| Real estate (conventional mortgage) | 337,548 | 656,591 | 725,997 | 957,023 | 1,161,828 | 1,155,844 | 1,226,239 | 1,349,751 |
| VA real estate | | | | 13,149 | 10,310 | 8,892 | 8,095 | 6,058 |
| Purchased paper | | | | | 79,000 | 152,200 | 53,000 | 47,000 |
| Dealers auto loans | | | | | | 384,657 | 609,048 | 318,584 |
| Home improvement loans | | | | | | | | |
| Mortgages in process | | | | | | | | |
| GI business | 1,305 | | | | | | | |
| Personal loans, insured installment | | 99,717 | | | | | | |
| Overdrafts | 1,017 | 1,017 | 710 | 3,803 | 557 | 2,139 | 306 | 1,523 |
| Total | 1,400,812 | 2,096,822 | 2,253,629 | 3,417,943 | 3,897,785 | 6,188,843 | 6,793,478 | 7,124,040 |

The amounts of closing loan balances of petitioner as heretofore set forth have not been reduced by any amounts of unearned discounts. Federal Housing Act (FHA) (12 U.S.C. sec. 1703) title I loans were 90-percent insured or guaranteed by the Federal Government. Federal Housing Act (FHA) (12 U.S.C. sec. 1707) title II loans were 100-percent insured or guaranteed by the Federal Government and Veterans' Administration (VA) real estate loans were 50-percent insured or guaranteed by the Federal Government.

Petitioner's income tax returns for the taxable periods here involved contained the following computation for its claimed deduction for additions to its reserve for bad debts:

| | Taxable year ended June 30, 1960 | Taxable year July 1 to Dec. 31, 1960 |
|---|---|---|
| Loans outstanding (closing) | $14,839,577.00 | $15,405,924.63 |
| Ratio—average bad debt ratio for banks in Chicago area, 1928–47 per Federal Reserve bank | .008375 | .008375 |
| Annual writeoff limitation | 124,281.46 | 129,025.00 |
| Maximum statutory reserve | 372,844.38 | 387,075.00 |
| Statutory reserve prior to current year addition | 286,992.16 | 360,853.35 |
| Deduction for addition to reserve | 85,852.22 | 23,000.00 |

| | Taxable year ended—Continued | | | | | | | | |
| June 30—Continued | | | | | | Dec. 31— | | | |
| 1955 | 1956 | 1957 | 1958 | 1959 | 1960 | 1960 (July 1–Dec. 31) | 1961 | 1962 | 1963 |
|---|---|---|---|---|---|---|---|---|---|
| $279,326 | $108,735 | $355,137 | $69,650 | $203,565 | $115,588 | $106,865 | $107,968 | $55,396 | $88,420 |
| 518,327 | 696,901 | 909,816 | 1,109,421 | 1,172,689 | 1,398,032 | 1,195,039 | 1,002,727 | 1,753,143 | 1,677,851 |
| 271,594 | 449,697 | 429,579 | 507,041 | 537,347 | 909,172 | 825,346 | 648,876 | 542,138 | 590,373 |
| 1,577,094 | 993,679 | 1,059,486 | 1,907,719 | 1,222,409 | 1,494,616 | 1,644,797 | 1,396,824 | 778,696 | 434,436 |
| 2,090,014 | 2,086,124 | 2,015,390 | 2,227,709 | 3,137,966 | 3,053,247 | 3,627,738 | 4,060,157 | 3,909,352 | 4,158,061 |
| 407,670 | 485,117 | 394,607 | 600,287 | 1,601,430 | 1,234,900 | 1,193,936 | 1,142,361 | 1,432,089 | 2,070,269 |
| 1,703,568 | 1,906,960 | 1,718,716 | 2,523,754 | 2,124,129 | 1,943,604 | 1,857,044 | 2,536,768 | 3,663,085 | 4,106,256 |
| 358,261 | 394,544 | 370,365 | 351,181 | 705,401 | 668,915 | 653,778 | 620,145 | 2,023,551 | 2,009,782 |
| 38,000 | 8,000 | 219,311 | 300,001 | 182,249 | 341,091 | 820,296 | 69,443 | 10,959 | 133,314 |
| 114,898 | 117,326 | 81,960 | 223,935 | 1,437,978 | 3,302,814 | 3,253,586 | 3,350,412 | 2,901,659 | 3,275,023 |
| 463,936 | 3,360,408 | 2,553,011 | 1,625,445 | 844,832 | 375,874 | 222,356 | 79,906 | 53,206 | 31,290 |
| | | | | | | | | 200,000 | 440,021 |
| 7,969 | 6,750 | 17,104 | 1,105 | 7,447 | 1,725 | 5,143 | 2,836 | 4,765 | 8,669 |
| 7,830,657 | 10,614,241 | 10,124,482 | 11,447,248 | 13,177,442 | 14,839,578 | 15,405,924 | 15,018,423 | 17,328,039 | 19,023,765 |

Respondent in his notice of deficiency disallowed the entire addition to reserve for bad debts claimed by petitioner in each of these years with the following explanation:

Bad debts deducted on your returns for the taxable year ended June 30, 1969 [sic] and the taxable period July 1, 1960 to December 31, 1960 in the respective amounts of $85,852.22 and $23,000.00 representing the additions to your reserve for bad debts for such year and such period, are disallowed since it has been determined that the existing reserves were adequate. Section 166 of the Internal Revenue Code of 1954. Computation is as follows:

| | June 30, 1960 | July 1, 1960–Dec. 31, 1960 |
|---|---|---|
| Loans outstanding as of end of year or period | $14,839,577 | $15,405,925 |
| Less: Insured or guaranteed loans | 4,732,856 | 5,484,944 |
| Loans subject to reserve computation | 10,106,721 | 9,920,981 |
| Average bad debt ratio for banks in Chicago area, 1928–47 per Federal Reserve bank, revised | .00831 | .00831 |
| Annual amount | 83,986.85 | 82,443.35 |
| Maximum statutory reserve 3×$83,986.85 and 3×$82,443.35 | 251,960.55 | 247,330.05 |
| Statutory reserve prior to current year addition | 286,992.16 | 286,992.16 |
| Allowable addition | None | None |
| Addition deducted | 85,852.22 | 23,000.00 |
| Bad debts disallowed | 85,852.22 | 23,000.00 |

The "Average bad debt ratio" of 0.00831 used in respondent's computation results from using petitioner's own experience for the period during which it was in existence and the loss experience on all loans

of member banks of the Seventh Federal Reserve District only for the portion of the period January 1, 1928, through December 31, 1947, during which petitioner was not in existence.

OPINION

Petitioner takes the position that its addition to reserve for bad debts for each of the years here involved is properly computed under the "alternative method" allowed by Rev. Rul. 54–148, 1954–1 C.B. 60, supplementing Mim. 6209, dated Dec. 8, 1947, 1947–2 C.B. 26, and therefore is a reasonable addition allowable under section 166(c) of the Internal Revenue Code of 1954.[1]  In the alternative petitioner

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Sec. 166(c) provides as follows:

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

The provisions of Mim. 6209, 1947–2 C.B. 26; Rev. Rul. 54–148, 1954–1 C.B. 60; Rev. Rul. 57–210, 1957–1 C.B. 94; and Rev. Rul. 57–350, 1957–2 C.B. 144–145 are lengthy. The portions of these rulings necessary to an understanding of the issues here raised are the following:

Mim. 6209, 1947–2 C.B. 26.

2. In determining a reasonable annual addition to a reserve for bad debts by a bank it is believed to be fair and sufficiently accurate to resort to the average annual bad-debt loss of the bank over a period of 20 years, to include the taxable year, as constituting a representative period in the bank's history and to accept the equivalent percentage of presently outstanding loans as indicative of the probable annual accruing loss. * * *

3. The Bureau has accordingly approved the use by banks of a moving average experience factor for the determination of the ratio of losses to outstanding loans for taxable years beginning after December 31, 1946. Such a moving average is to be determined on a basis of 20 years, including the taxable year, as representing a sufficiently long period of a bank's experience to constitute a reasonable cycle of good and bad years. * * *

4. In computing the moving average percentage of actual bad debt losses to loans, the average should be computed on loans comparable in their nature and risk involved to those outstanding at the close of the current taxable year involved. Government insured loans should be eliminated from prior year accounts in computing percentages of past losses, also from the current year loans in computing allowable deductions for additions to the reserve. * * *

5. A newly organized bank or a bank without sufficient years' experience for computing an average as provided for above will be permitted to set up a reserve commensurate with the average experience of other similar banks with respect to the same type of loans, preferably in the same locality, subject to adjustment after a period of years when the bank's own experience is established.

Rev. Rul. 54–148.

SEC. 4. ALTERNATIVE METHOD.

.01 In lieu of the moving average experience factor provided in paragraph 3 of Mimeograph 6209, which is determined on a basis of 20 years including the taxable year, a bank may use an average experience factor based on any 20 consecutive years of its own experience after the year 1927. Such average experience factor, representing the percentage of bad debt losses to loans for the period selected, applied to loans outstanding at the close of the taxable year, determines the maximum permissible addition to the reserve for the year.

*      *      *      *      *      *      *

.03 Consistent with the provisions of Mimeograph 6209 which permit newly organized banks and banks without sufficient years' experience of their own to set up a reserve commensurate with the average experience of other similar banks with respect to the same type of loans, preferably in the same locality, banks which select a 20-year period under (.01) above which extends back into years for which they have no experience of their own will be permitted to fill in such years with similar comparable data.

.04 The provisions of paragraph 6 of Mimeograph 6209 relating to the treatment of specific bad debt losses and recoveries, and all other rules utilized in the application of

contends that if its computations are not in accordance with respondent's rulings, the addition has nevertheless been shown to be reasonable under section 166(c) and respondent's regulations issued pursuant thereto.

Respondent contends that petitioner's computation of additions to its reserve for bad debts is not in accordance with Mim. 6209 and related rulings and that petitioner has not otherwise shown that the amounts of such additions are reasonable under section 166(c) and respondent's regulations issued pursuant thereto.[2]

In several cases we have stated that the ultimate question for decision, where the respondent has disallowed all or a portion of an addition to a reserve for bad debts, claimed by a taxpayer to be computed in accordance with Mim. 6209, is not the detail of the computation under the mimeograph but whether the taxpayer has proved error in respondent's determination by showing the bad debt reserve allowed by respondent to be unreasonable under section 166(c). See *Miners National Bank of Wilkes-Barre*, 33 T.C. 42 (1959), *Central Bank Co.*, 39 T.C. 856 (1963), remanded 329 F. 2d 581 (C.A. 6, 1964), and *First National Bank in Olney*, 44 T.C. 764 (1965).

However, in the instant case since respondent is in effect conceding that a proper computation under Mim. 6209 and his related rulings would result in an amount which would represent a reasonable addition to petitioner's reserve for bad debts in each of the years here involved, we will first consider whether petitioner's computation is in accordance with respondent's rulings. See the discussions in this regard in *North Carolina National Bank* v. *United States*, 345 F. 2d 544 (Ct. Cl. 1965); *Pullman Trust & Savings Bank* v. *United States*, 235 F. Supp. 317 (N.D. Ill. 1963), affirmed per curiam 338 F. 2d 666 (C.A. 7, 1964); and *American State Bank* v. *United States*, 279 F. 2d 585 (C.A. 7, 1960).

---

Mimeograph 6209 shall, to the extent not inconsistent, be applicable to the alternative method.

Rev. Rul. 57–210.

Upon review, it is concluded that the term "Government insured loans," as used in Paragraph 4 of Mimeograph 6209, *supra*, should not be construed to include only loans which are 100 percent Government insured or guaranteed. In its ordinarily understood sense and definition, the term refers to any loans which are Government insured or guaranteed, in whatever extent or percent. Hence, the eliminations provided for in the Mimeograph of such loans should be made accordingly, i.e., in entirety if the loan is 100 percent Government insured or guaranteed, etc. Such application of these provisions of the Mimeograph accords with the general purpose of reserves for bad debts to which it relates.

Rev. Rul. 57–350.

For that portion of the 20-year period selected during which the bank was in existence, it is required to use its own experience. * * * Thus, for example, a bank with continuous existence since December 31, 1933, may select the period 1930 through 1949, use its own bad debt experience for the years 1934 through 1949, and fill in the years 1930 through 1933 with the bad debt experience for those years of other similar banks, preferably in the same locality.

[2] Respondent in his reply brief states: "* * * If the Court should determine that taxpayer's computation of additions to its reserve for bad debts is properly made under Mim. 6209 et al., then respondent does not contend that such additions are not reasonable under Sec. 166(c) of the 1954 Code."

From a mere reading of Mim. 6209 and respondent's related rulings it is apparent that petitioner has not complied therewith in the following two respects:

(1) The elimination of the insured portion of Government-insured loans from the loans outstanding at the end of each of the years here involved before applying the bad debt factor[3] as required by paragraph 4 of Mim. 6209 and Rev. Rul. 57–210.

(2) The use of petitioner's own experience for the portion of the 20-year period January 1, 1928, through December 31, 1947, during which it was in existence as required by Rev. Rul. 57–210.

Petitioner, however, contends that since its experience demonstrates that losses were incurred on loans insured or guaranteed under the provisions of the Federal Housing Act it should not be required to eliminate these loans in making its computation under Mim. 6209. In particular, petitioner asserts that it suffered bad debt losses on loans insured under title I of the National Housing Act by reason of the fact that such loans are insured only to the extent of 90 percent of their face amount and petitioner receives no further recovery in the event of default on these loans. This argument is not impressive since the uninsured portion of such loans (10 percent) is included in petitioner's outstanding loans at the end of each year in respondent's computation. The same situation exists as to the partially insured Veterans' Administration loans.

Petitioner also asserts that it suffered bad debt losses on 100-percent Government-insured loans, under the National Housing Act, title II, in that the Federal Housing Administration did not compensate petitioner in cash for defaulted loans, but instead compensated petitioner in Federal Housing Authority debenture bonds, which varied in market value from 85 percent to 100 percent of face value.

Petitioner introduced no evidence of any specific instance of its receipt of Federal Housing Authority debenture bonds for defaulted loans or its policy as to keeping or selling such bonds if it received any. If these bonds varied in value it might be that any loss on the sales thereof was not charged by petitioner to its bad debt reserve but was treated as a loss from sale of securities.

Therefore, even if petitioner is correct that it does not have to show strict compliance with the provisions of Mim. 6209 and respondent's related rulings in its computation thereunder, it has failed to sustain its burden of proof in the instant case of showing that the elimination of the Government-insured portion of the loan is unreasonable. Cf. *North Carolina National Bank* v. *United States, supra,* and *Pullman*

---

[3] The parties refer to elimination of Government-insured loans, but a mere addition of the total of petitioner's Government-insured loans as of the close of each year here involved as set forth in our findings shows that respondent in fact only eliminated the insured portion of those loans.

*Savings & Trust Bank* v. *United States, supra,* in which the courts said that a computation in accordance with Mim. 6209 is presumed to be reasonable, a conclusion which respondent here concedes.

Petitioner also contends that the data for all Federal Reserve banks in the Seventh District includes Government-insured loans and therefore to be comparable similar loans should be included in its current loans when applying the bad debt ratio from this data to such loans to compute its addition to its bad debt reserve. The evidence shows that no FHA loans were included in data of Federal Reserve banks for years prior to 1934 and the extent, if any, to which such loans were included from 1934 through 1947 is not shown by the evidence. If such loans were included in a sufficient amount to make this data lack comparability with petitioner's current year loans, after eliminating the insured portion of Government-insured loans, then petitioner has failed in another respect to meet the requirements of paragraph 5 of Mim. 6209, and section 4.03 of Rev. Rul. 54–148 which requires the substituted experience used to be of similar banks with respect to the same type of loans.

Respondent contends that instead of using the data of all banks in the Seventh Federal Reserve District for the entire period January 1, 1928, through December 31, 1947, petitioner should have used its own experience for the portion of this period during which it was in existence as required by Rev. Rul. 57–210, 1957–1 C.B. 94. Respondent relies on *Union National Bank & Trust Co. of Elgin,* 26 T.C. 537 (1956), and *First National Bank of LaFeria,* 24 T.C. 429 (1955), affirmed per curiam 234 F. 2d 868 (C.A. 5, 1956), in support of his position.

The record shows that petitioner had no bad debt chargeoffs for its taxable years ended June 30, 1947, and June 30, 1948, indicating that for the entire period September 18, 1946, through December 31, 1947, it incurred no bad debts. There is no evidence to show that there was any abnormality in this period other than it being petitioner's first period of operations.

In the recent case of *First National Bank in Olney, supra,* we held under circumstances in substance indistinguishable from those here present that a taxpayer computing its bad debt reserve under the provisions of Mim. 6209 and related rulings must use its own experience for its beginning years when such years fall in its selected 20-year period. This is the requirement of the various rulings and petitioner has shown nothing arbitrary in applying this requirement to it.

We hold that petitioner has failed to show that it complied with the provisions of Mim. 6209 and related rulings in computing its addition to reserve for bad debts for the years here in issue.

The cases of *Pullman Trust & Savings Bank* v. *United States, supra,* and *Union National Bank of Youngstown* v. *United States,* 237 F.

Supp. 753 (N.D. Ohio 1965), are distinguishable on their facts from the instant case for the same reason we considered them distinguishable from the factual situation present in *First National Bank in Olney, supra.*

There is no showing here that petitioner's own experience from the date of its organization to December 31, 1947, was not "meaningful."

Petitioner in the alternative takes the position that apart from Mim. 6209 and related rulings it has shown that its claimed addition to reserve for bad debts in each of the years here in issue is reasonable under section 166(c) and Income Tax Regs., sec. 1.166–4(b) (1).[4]

In *First National Bank in Olney, supra*, we stated (p. 781):

the failure of a taxpayer to show compliance with the mimeograph and supplementary rulings standing alone does not necessarily require an adverse decision any more than a showing of compliance standing alone necessarily requires a favorable decision. In each instance the decision must be based on the record as a whole.

The question is not whether the additions to the reserve for bad debts are sufficient to absorb the bad debts that might arise during the years involved but rather whether the reserve itself was sufficient for that purpose. *Krim-Ko Corporation*, 16 T.C. 31 (1951).

The evidence in this case does not show that respondent's determination was unreasonable, arbitrary, or an abuse of the discretion vested in him by statute. For the 14-year period beginning with the taxable year ended June 30, 1947, and ending with the taxable year ended June 30, 1960 (the first taxable year here in issue), the total net bad debt chargeoff by petitioner was $259,169 and the average annual net bad debt chargeoff for the period was $18,512. As of June 30, 1960, petitioner's bad debt reserve was $286,992, roughly 15.5 times its average annual net bad debt chargeoff.

For the 1½-year period here involved, the total bad debt chargeoff was $56,082.[5] In view of the fact that a short taxable year is here involved, the approximately average annual bad debt experience for this period was $37,388.[6]

Petitioner's bad debt reserve after disallowance of additions by respondent, was $275,001 at the close of the short taxable year July 1,

---

[4] Sec. 1.166–4(b) (1) *Relevant factors.* What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.

[5] Bad debt experience for the year ended June 30, 1960, was $44,091, and for the taxable year July 1, 1960, to Dec. 31, 1960, was 11,991

Total 56,082

[6] Total bad debts for period here in issue $56,082 ÷ 1.5 years = $37,388.

1960, through December 31, 1960, or 7.3 times petitioner's average annual bad debt chargeoffs for the years here in issue. Reserves which are from 7 to 15 times petitioner's past average annual bad debt charge-offs are reasonable absent some showing of unusual circumstances. Cf. *Paramount Liquor Co.* v. *Commissioner*, 242 F. 2d 249 (C.A. 8, 1957), affirming a Memorandum Opinion of this Court; *First National Bank in Olney*, *supra;* and *Krim-Ko Corporation*, *supra*.

Petitioner has shown no facts to indicate that it anticipated any large increase in its bad debts losses as of the end of either year here in issue.

Petitioner, however, contends that banks are a unique class of taxpayers which should be entitled to more lenient treatment than other businesses in computing their reserves for bad debts for the protection of depositors. This argument does not resolve the question of what is a reasonable reserve for any particular bank.

Petitioner's chief executive officer testified that he considered a reasonable reserve for bad debts for petitioner to be 5 percent of outstanding dealer auto loans, 1 percent of outstanding Government-insured or guaranteed loans, and 2.5 percent of other outstanding loans. These percentages are not supported by petitioner's bad debt experience and this witness gave no reasonable basis for his opinion.

As we pointed out in *C. P. Ford & Company, Inc.*, 28 B.T.A. 156, 158 (1933), a taxpayer has an absolute right to deduct his worthless debts when they are ascertained to be worthless and charged off, but if he chooses to deduct additions to a reserve he subjects himself to the reasonable discretion of the Commissioner. Petitioner in the instant case has not shown that respondent's disallowance of its claimed deductions for additions to its bad debt reserve in the years here involved was not a reasonable exercise of respondent's discretion.

*Decision will be entered under Rule 50.*