STATE FARM ROAD CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3720-74.    Filed November 3, 1975.

*Robert V. Hunter,* for the petitioner.
*Bernard R. Baker III,* for the respondent.

OPINION

Since both parties seek to align the facts of this case with various legal formulations of what constitutes a nonshareholder contribution to corporate capital, including the test recently set forth in *United States v. Chicago, Burlington & Quincy R. Co.,* 412 U.S. 401 (1973), a brief historical discussion is in order to determine the scope of that term for purposes of section 118(a).[5]

The exclusion from income of nonshareholder contributions to capital derives from *Edwards v. Cuba Railroad Co.,* 268 U.S. 628 (1925), where it was held that Government subsidies to a railroad to induce the construction of railroad facilities in Cuba were not taxable income within the meaning of the 16th amendment. In the wake of that decision, a series of cases followed in which the Board of Tax Appeals found that payments to various railroad and electric companies to induce the extension of service did not constitute income.[6]

The excludability of payments to a utility company by prospective customers in order to make it possible for the company to extend service lines to rural areas, which it would not have been otherwise profitable to serve, went without Government challenge in *Detroit Edison Co. v. Commissioner,* 319 U.S. 98 (1943). The Supreme Court instead was called upon to decide the availability of a depreciation deduction for that portion of the taxpayer's property financed by the customers' nonrefundable payments. Detroit Edison claimed the basis in such property was not limited to its own costs and that it was entitled to include its expenditures of customers payments, since such payments were either gifts or contributions to capital.

---

[5] SEC. 118(a). GENERAL RULE.—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.

[6] The cases are collected in *Teleservice Co. of Wyoming Valley,* 27 T.C. 722, 727 (1957), affd. 254 F. 2d 105 (3d Cir. 1958).

Rejecting the taxpayer's contentions, the Court said (319 U.S. at 102-103):

It is enough to say that it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. The transaction neither in form nor in substance bore such a semblance.

The payments were to the customer the price of the service.

The Court went on to say (id. at 103) that these service payments were not taxed as income "presumably because it has been thought to be precluded by this court's decisions in *Edwards v. Cuba R. Co.*, 268 U.S. 628," the suggestion being that such presumption was incorrect.

The Supreme Court subsequently drew a distinction between payments to a corporation by prospective customers to induce extensions of services and payments to a corporation by community groups to induce the location of a factory in their community. In *Brown Shoe Co. v. Commissioner*, 339 U.S. 583 (1950), the Court held the latter to be capital contributions, the expenditure of which could properly be included in the taxpayer's basis for depreciation. Since the payments did not buy any direct services but only benefited the general community, the Court reasoned that contributions "manifested a definite purpose to enlarge the working capital of the company." 339 U.S. at 591.

The question raised in *Detroit Edison Co. v. Commissioner, supra,* about the breadth of *Edwards v. Cuba Railroad Co., supra,* the seeming incompatibility of *Detroit Edison* with *Brown Shoe Co. v. Commissioner, supra* (see *United States v. Chicago, Burlington & Quincy R. Co.,* 412 U.S. at 412 n. 13), and the 1954 codification of the excludability of capital contributions from income under section 118 (see p. 227 *infra*), with its accompanying reduction in basis provisions, section 362, shifted the case emphasis back to the inclusion-exclusion from income issue.

In 1957, we faced the problem of the proper characterization of payments solicited from prospective customers to finance construction costs by a corporation operating a community television antenna system. *Teleservice Co. of Wyoming Valley,* 27 T.C. 722 (1957), affd. 254 F.2d 105 (3d Cir. 1958). We found a strong analogy between the facts in *Teleservice* and those in *Detroit Edison Co. v. Commissioner, supra,* and held accordingly.

Deciding that the customer payments were not contributions to capital, we said (see 27 T.C. at 730):

there was nothing altruistic in the motive which prompted the petitioner's prospective customers to finance the television antenna system; they wanted television service and they were willing to pay for it. If the system had already been constructed and available they would have paid a larger monthly charge and this unquestionably would have been within the petitioner's gross income. Since the facilities were not available and due to the risk involved, the only way that the petitioner could be induced to give service was by the receipt of something in addition to the monthly charge, namely, contributions to enable it to construct extensions of the antenna system. Contributions received in this manner are within the gross income of the petitioner.

We also recognized the tension created with past cases (see n. 6 *supra*) and made our determination "in spite of the voluminous authority" to the contrary. 27 T.C. at 729. Affirming our decision, the Court of Appeals agreed that the cases were indistinguishable factually and said of the prior cases "we are not in accord." 254 F.2d at 112.

Following the decision in *Teleservice Co. of Wyoming Valley, supra,* respondent issued Rev. Rul. 58-555, 1958-2 C.B. 25, to reconcile his success in *Teleservice* with his earlier acquiescences in Board of Tax Appeals decisions holding prospective customer payments to various regulated public utilities to be contributions to capital. The ruling seizes upon the classification of the recipients as regulated public utilities in the earlier cases as the critical distinction.

Thereafter, we had occasion to consider the impact of this ruling and, on the authority of *Teleservice Co. of Wyoming Valley, supra,* rejected respondent's distinction between public utility and nonpublic utility cases and rejected the one decision (*Fairfax County Water Authority v. United States,* 223 F. Supp. 620 (E.D. Va. 1963)) that had accepted the distinction. *Irving J. Hayutin,* T.C. Memo. 1972-127, affd. 508 F.2d 462 (10th Cir. 1974). In its affirmance, the Court of Appeals also relied on *Teleservice.* Additionally, it treated Rev. Rul. 58-555, *supra,* as well as Rev. Rul. 66-353, 1966-2 C.B. 111, somewhat more softly by finding them inapplicable because the payments in question were made for services (see 508 F.2d at 480-481), and, presumably for this reason, ignored *Fairfax County Water Authority v. United States, supra.*

In 1973, the Supreme Court returned to the depreciation issue under the 1939 Code and enunciated a five-pronged test for

determining whether pre-1954 Government subsidies to a railroad are nonshareholder contributions to capital which should be included in the railroad's basis. *United States v. Chicago, Burlington & Quincy R. Co., supra.* Drawing upon the facts of *Detroit Edison Co. v. Commissioner, supra,* and *Brown Shoe Co. v. Commissioner, supra* (both also involving depreciation deductions), but moving away from the "motivation-of-the-transferor" test applied therein,[7] the Court said (see 412 U.S. at 413):

> We can distill from these two cases some of the characteristics of a nonshareholder contribution to capital under the Internal Revenue Codes. It certainly must become a permanent part of the transferee's working capital structure. It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. It must be bargained for. The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. And the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect.[8]

That the Court did not intend to lay a rigid analytical framework for problems arising under section 118 is clear from its statement that:

> Whether the governmental subsidies qualified as income to the railroad is an issue not raised in this case, and we intimate no opinion with respect to it. [412 U.S. at 408.]

The climate created by the judicial history dealing with contributions to capital is, to say the least, strange. To a very large degree, this is attributable to the confusion arising as much from what the Supreme Court did not say as from what it did say in *Detroit Edison Co. v. Commissioner, supra, Brown Shoe Co. v. Commissioner, supra,* and *United States v. Chicago, Burlington & Quincy R. Co., supra,* cases involving the proper basis for

---

[7] The Court reconciled these two cases on the ground of the intent of the transferors, but found this "intent factor" insufficiently related to the economic reality with which it was concerned in determining the depreciability of the railroad's assets. See 412 U.S. at 411-412.

[8] One criterion and the Court's interpretation thereof shed additional doubt on the distinction drawn in Rev. Rul. 58-555, 1958-2 C.B. 25. Under the "benefit-to-the-transferee" prong of its test, an integral element of a contribution to capital, the Court explained that, because the taxpayer in *Detroit Edison* was a public utility with a regulated rate of return and because the extension of service lines to rural customers would not have warranted the investment by the utility itself, the transferee's benefit received by the customer-financed extension was only marginal. 412 U.S. at 413. Thus, at least with respect to the depreciation deduction issue, public utility status may be a factor against customer payments qualifying as contributions to capital.

depreciation where the criteria for decision are not necessarily the same as those applicable in a case such as this where the issue is exclusion from income under section 118.[9] Thus, in *Detroit Edison Co. v. Commissioner, supra,* the payments were held not to be contributions to capital or gifts, but there was no holding as to their tax character except for an implication that they might be income, in which event they might well have been considered proper additions to basis. See Opper, *J.,* concurring in *Teleservice Co. of Wyoming Valley,* 27 T.C. at 730-732. Similarly, in *United States v. Chicago, Burlington & Quincy R. Co., supra,* the payments were held not to be contributions to capital but the Supreme Court expressly disavowed even an intimation as to whether they constituted income.

In contrast to the foregoing puzzling background, we turn to the somewhat cursory but nevertheless revealing legislative history of section 118. In evaluating that history, we also take into account the facts that *Edwards v. Cuba Railroad Co., supra,* is clearly distinguishable and that, in any event, its effect has been substantially muted, if not eliminated, by the broad sweep accorded section 61 in *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426 (1955), *General American Investors Co. v. Commissioner,* 348 U.S. 434 (1955), and *Commissioner v. LoBue,* 351 U.S. 243 (1956). See *Teleservice Co. of Wyo. Val. v. Commissioner,* 254 F. 2d 105, 108 (3d Cir. 1958). See also Note, "Taxation of Nonshareholder Contributions to Corporate Capital," 82 Harv. L. Rev. 619, 622 (1969).

The 1954 codification, via section 118, intended as an incorporation of existing decisional law, was designed to deal with those transfers to a corporation that fall in the gray area between genuine gifts, on the one hand, and payments clearly for direct future services, on the other hand. The legislative history speaks of contributions to capital as in the case where "the contributor expects to derive indirect benefits, the contribution cannot be called a gift; yet the anticipated future benefits may also be so intangible as to not warrant treating the contribution as a

---

[9] It is significant that, in each of these cases, the Court was confronted by a taxpayer who had excluded the payments from income (which treatment was not questioned) and was, at the same time, claiming a further tax benefit by asserting its right to include such payments in its basis for depreciation. The right to such a double tax benefit, while not automatically precluded, is certainly open to question. Compare *United States v. Skelly Oil Co.,* 394 U.S. 678, 685 (1969): "We cannot believe that Congress intended to give taxpayers a deduction for refunding money that was not taxed when received."

payment for future services." S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 18-19 (1954); H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 17 (1954).

This singular inquiry into the remoteness of the transferor's anticipated benefits is precisely the one we made in *Federated Department Stores, Inc.*, 51 T.C. 500, 519 (1968), affd. 426 F.2d 417 (6th Cir. 1970).[10] We also are constrained to note this was the frame of reference the Supreme Court used in *United States v. Chicago, Burlington & Quincy R. Co., supra,* to distinguish *Detroit Edison Co. v. Commissioner, supra,* from *Brown Shoe Co. v. Commissioner, supra,* the Court stating (412 U.S. at 411) that the "decisional distinction" between those two cases—

rested upon the nature of the benefit to the transferor, rather than to the transferee, and upon whether that benefit was direct or indirect, specific or general, certain or speculative. These factors, of course, are simply indicia of the transferor's intent or motive.[11] [Fn. ref. omitted.]

Petitioner seizes upon several elements to justify its position. First, it points out that its agreement with the town of Guilderland characterizes the tie-in charges as "contributions to capital" and that it reduced its basis for depreciation by the amount of such charges. The short answer to this agreement is that petitioner may not bootstrap itself into a favorable decision by self-serving characterizations or actions. See *Teleservice Co. of Wyo. Val. v. Commissioner, supra.* Moreover, we note in this connection that the funds representing the tie-in charges were not segregated. Cf. Rev. Rul. 74-563, 1974-2 C.B. 38. Second, petitioner urges that, unlike the subscriber in *Teleservice,* a subsequent homeowner did not have to pay the tie-in charge. But the fact of the matter is that, in *Teleservice,* the subscriber did not have again to pay the hookup charge if he moved to another home in the area. Thus, in *Teleservice,* the benefit of the tie-in charge ran with the person whereas, in the instant case, it ran with the land.[12] Third, petitioner urges that there was no relationship between the tie-in charges and ability to pay or between residential and other subscribers, one of the criteria

[10] See also *May Department Stores Co.,* T.C. Memo. 1974-253, affd. per curiam __ F.2d __ (8th Cir. 1975, 36 AFTR 2d 75-5503, 75-2 USTC par. 9628).

[11] Significantly, the Supreme Court cited *Teleservice,* and the legislative history of sec. 118 in support of its statement. See 412 U.S. at 411-412 n. 12.

[12] Moreover, there was a limit placed on the tie-in charges which could be imposed and refunds were required under certain circumstances.

suggested in Rev. Rul. 58-555, *supra*. But we find no such distinction in the decided cases. Additionally, it is clear that the tie-in charges were geared to anticipated use. We also note that the record herein is far from clear that the amounts paid by owners of residences were not in fact calculated differently from those paid by other subscribers, such as the school district. Finally, petitioner urges that the tie-in charges were paid with the view towards reaping only the general community benefit that accrues from having a sewage collection and treatment system. But it is clear that only those structures for which a tie-in charge was paid could hookup to the system and take advantage of the collection and treatment services. When the transactions are viewed in their entirety, the payments had a "reasonable nexus with the services which it was the business of the recipient corporation to provide." *Federated Dept. Stores v. Commissioner*, 426 F. 2d 417, 421 (6th Cir. 1970).

We also think it significant that the fruition of the plans of the shareholders of petitioner to develop the Heritage Village Apartments Complex depended upon having the sewer system established.[13] In this context, it can be argued that petitioner is not the type of regulated public utility which respondent had in mind when he carved out the exception contained in Rev. Rul. 58-555, *supra*. But respondent has made no argument in respect of this point[14] and consequently we express no opinion as to whether this could be a ground for holding that ruling inapplicable. In any event, although we have reiterated herein our distaste for Rev. Rul. 58-555, we find it unnecessary expressly to declare that the distinction contained therein is invalid under all circumstances. It is enough for us to say that the elements present herein are sufficient to bring this case within the caveat of that ruling on the ground that it is "not substantially similar to the public utility cases to which the acquiescences [contained in the ruling] relate." In short, we see no reason to extend to petitioner the benefit of the exception carved out by respondent in Rev. Rul. 58-555, *supra*, even though that exception might be erroneous. Compare Mr. Justice Frankfurter concurring in *United States v. Kaiser*, 363 U.S. 299, 308

[13] The record does not reveal whether such shareholders also had an interest in the plans for the townhouse development known as "Presidential Estates" or the housing development to be constructed by Goswift Investors.

[14] See respondent's concession that the taxpayer was a regulated public utility in *Irving J. Hayutin*, T.C. Memo. 1972-127, n. 19.

(1960).[15]

We find that the tie-in charges paid to petitioner were directly related to the services petitioner subsequently rendered. We believe that the circumstances surrounding such payments are substantially similar to those in *Detroit Edison Co. v. Commissioner, supra,* and *Teleservice Co. of Wyoming Valley, supra,* so as to preclude a finding that such payments were a contribution to capital and to require us to hold that they constituted taxable income to petitioner. In reaching this conclusion we have taken note of Mr. Justice Holmes' statement that "a page of history is worth a volume of logic" (see *New York Trust Co. v. Eisner,* 256 U.S. 345, 349 (1921)) and have concluded that, had he been called upon to decide this case, he would have written "a page of logic is worth a volume of history."

*Decision will be entered for the respondent.*

---

[15] We note in passing that this is the reverse of the usual case where the taxpayer is claiming (as petitioner, for obvious reasons, does not) that the Government is discriminating *against* him by not according him the benefits conferred upon others. Cf. *Moritz v. Commissioner,* 469 F.2d 466 (10th Cir. 1972), revg. 55 T.C. 113 (1970). See also *James C. Bradford,* 60 T.C. 253, 259 (1973). In this connection, it is interesting to observe that the consequence of invalidating the distinction in favor of regulated public utilities contained in Rev. Rul. 58-555, *supra,* would appear to be the elimination of the exception and the consequent subjection of petitioner to the standards usually applied in determining whether the tie-in charges were income—in short, precisely what we have in fact done. See *Moritz v. Commissioner,* 469 F.2d at 470.